W

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK S. MAJKA,                               )
                                             )
                Plaintiff,                   )
                                             )
        v.                                   )    No. 05 C 3017
                                             )
JO ANNE B. BARNHART, COMMISSIONER            )    Judge Nan R. Nolan
OF SOCIAL SECURITY,                          )
                                             )
                Defendant.                   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark S. Majka claims that he is disabled due to sleep dysfunction; depression;

headaches; muscle spasms in his neck; pain in his lower back, neck, arm, and finger; and chronic

pain from severe whiplash sustained in an automobile accident. He filed this action seeking review

of the final decision of the Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42

U.S.C. §§ 416, 423(d). The parties have consented to the jurisdiction of the United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary

judgment. For the reasons set forth here, the Commissioner's motion is granted and Majka's

motion is denied.

## PROCEDURAL HISTORY

Majka applied for DIB on November 29, 2002, claiming that he became disabled on August

26, 2002 due to limitations caused by a perianal abscess, musculoskeletal injuries sustained in a

September 2002 automobile accident, and a nervous system disorder. (R. 55-57, 65.) The

application was denied initially on February 5, 2003, and again on reconsideration on July 31, 2003.

(R. 30, 36.) Majka appealed the decision and requested an administrative hearing, which was held

on June 9, 2004. (R. 42, 271.) On August 25, 2004, the Administrative Law Judge ("ALJ") denied

Majka's claim for benefits, finding that he has the residual functional capacity ("RFC") to perform

at least a significant range of light work. (R. 22.) The ALJ found that Majka's allegations of pain were not credible when compared with both the objective medical evidence, and his own testimony that he moved to a third-floor apartment where he cared for himself and did not wear a muscle stimulator jacket as often as he should. (R. 20.) The ALJ concluded that Majka had past relevant work as a retail electronics salesman, project manager, and technical consultant and was thus not entitled to disability benefits. (R. 21-22.) Majka now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Majka was born on January 26, 1963 and was 41 years old at the time of the hearing before the ALJ. (R. 487.) Majka has a high school diploma and completed two years of college to receive an Associates Degree in Telecommunications Engineering. (R. 15.) As of the hearing date, he was separated from his wife and living alone in a third-floor apartment. (R. 487, 494.) Between 1991 and April 2001, Majka worked in the computer repair and telecommunications industries, advancing from Regional Field Consultant to Regional Manager to Project Manager. (R. 66.) From April 2001 to July 2002, Majka worked as a sales consultant at Tweeter Home Entertainment. (R. 489.)

## A.    Medical History

On August 28, 2002, Majka reported to the Delnor Community Hospital emergency room and was diagnosed with a perianal abscess. The attending physician drained the cyst and released Majka the same day. (R. 128-29.) On December 27, 2002, Majka underwent a surgical procedure to remove the abscess, which was then characterized as a pilonidal cyst.[1] (R. 296.)

---

[1]      A "pilonidal cyst" is a cyst at the bottom of the tailbone that can become infected and filled with pus. (http://www.emedicinehealth.com/pilonidal_cyst/article_em.htm).

On September 19, 2002, Majka was involved in an automobile accident and sought treatment at the Delnor emergency room the following day. (R. 115.) An x-ray of Majka's cervical spine showed no fracture or other bony abnormalities, and an x-ray of his lumbar spine revealed only a slight narrowing of the disk space at L4-L5. (R. 122-23.) The hospital discharged Majka with a diagnosis of cervical spine strain, left shoulder sprain, and lumbar spine strain. (R. 119.) Between October 1 and November 22, 2002, Majka received treatment from orthopedic surgeon Dr. Robert T. Vraney. (R. 131-36.) Dr. Vraney found "[no]thing that would seem to qualify as true radiculopathy" (i.e., pain, numbness, tingling, or weakness), but noted that Majka complained of paresthesia.[2] (R. 134.) Dr. Vraney also stated that neurological exams were normal, but observed that Majka was "quite dramatic in a lot of his pain behaviors." Dr. Vraney expressed concern that Majka was exaggerating his symptoms, noting that he had no signs of myelopathy (spinal cord injury), no paraspinal muscle spasm, and full range of motion. (R. 133.) In addition, Majka reported continuing to wear a soft neck brace despite Dr. Vraney's recommendation that he not do so given his ability to "move[] quite fluidly" without it. (R. 132-33.) Dr. Vraney described an MRI of Majka's neck as "quite unimpressive," and found "very minimal degenerative type changes and nothing that would explain the wide variations of symptoms that Mr. Majka complains of." (R. 131.)

On November 12, 2002, Dr. Noam Stadlan examined Majka and observed that he had occasional twitching of the arms and shaking upon ambulation. Dr. Stadlan stated, however, that he was unsure of the etiology of Majka's pain, and that "[a] lot of his tremors and complaints appear to be non-anatomic." Dr. Stadlan also noted that "[w]hen [Majka] is not being observed, he does not appear to have any abnormal movements." At that time, Majka was taking Naprosyn (an anti-inflammatory), Vicodin, and Skelaxin (a muscle relaxant). (R. 176-77.)

---

[2]     "Paresthesia" is "[a]n abnormal sensation of the skin, such as numbness, tingling, pricking, burning, or creeping on the skin that has no objective cause." (http://www.medterms.com/script/main/art.asp?articlekey=4780.)

Between November 18 and December 26, 2002, Majka participated in a cervical rehabilitation program at Orthosport Physical Therapy. Majka tolerated the treatment fairly well, but "continue[d] to present with neurological symptoms that are inconsistent with medical diagnosis of cervicalgia."[3] (R. 145-46.) Also on November 18, 2002, Majka was examined by Dr. Jerry Bauer. Dr. Bauer found that Majka had neck and back pain with no significant spinal cord or nerve root compression and no need for surgery. (R. 182.) Majka showed "limited effort on strength testing" but Dr. Bauer saw "no obvious weakness of his arms or legs," and inconsistent sensory testing. (Id.)

On December 24, 2002, State Agency psychologist Dr. Ronald J. Ganellen, Ph.D., performed a psychological evaluation of Majka. (R. 404.) Dr. Ganellen found that "[t]he variety and intensity of the symptoms [Majka] described are unusual even for patients with a documented medical condition." (R. 406.) In Dr. Ganellen's view, this suggested that Majka's physical problems were "likely to be out of proportion to objective medical findings," and that "psychological factors play a significant role in his report of symptoms and how he copes with medical problems." (R. 406-07.) Dr. Ganellen found Majka's presentation to be "consistent with a Pain Disorder with both medical and psychological factors (DSM-IV 307.89)." He recommended caution in prescribing medications for Majka and suggested that he might benefit from supportive psychotherapy. (R. 408.) At the time, Majka was taking Vicodin, Diazepam (an anti-anxiety medication), Skelaxin, and Lexapro (an anti-depressant). (R. 406.)

On January 14, 2003, Majka was admitted to Marianjoy Rehabilitation Hospital, a DuPage Convalescent Subacute Rehab facility, for managed wound care following the surgical removal of the pilonidal cyst. (R. 421.) Dr. Richard Krieger noted that Majka reported ongoing muscle spasms from the car accident and that he had a possible herniated cervical disk and lumbar degenerative

---

[3]     "Cervicalgia" is "a pain in the neck which does not radiate outwards." (http://www.sportsinjuryclinic.net/cybertherapist/back/upperbackneck/neckpain.htm.)

disk disease. (R. 423.) Dr. Krieger's treatment plan included physical therapy to work on mobility and pain reduction techniques; occupational therapy; and assistance from the DuPage Pain Management Clinic. (*Id.*) The following day, on January 15, 2003, Majka had a consultation with Dr. Edward Yang of Central DuPage Hospital. (R. 375.) Dr. Yang diagnosed neck and back pain due to a whiplash-type injury that seemed to be "myofascial in nature due to diffuse nature of the pain."[4] Dr. Yang encouraged Majka to continue on his current medications, including Naproxen (an anti-inflammatory), Valium, and Vicodin, and prescribed a muscle relaxant (Zanaflex) and a sleep aid (Elavil). (R. 376.)

By January 28, 2003, Majka's pain was under better control and he was discharged from Marianjoy on January 30, 2003. (R. 416, 420.) Dr. Krieger instructed Majka to follow-up with his pain management team and to continue his outpatient therapy for the muscle spasms. (R. 417.) On January 29, 2003, State Agency physician Vidya Madala, M.D. reviewed Majka's claim file and concluded that he could occasionally lift 50 pounds; frequently lift 25 pounds; stand, walk, and sit for about 6 hours in an 8-hour workday; occasionally perform balancing; and frequently perform all other postural limitations. Dr. Madala stated that Majka "should be capable of medium work activity within 1 year of accident." (R. 444-51.)

Majka next saw Dr. Yang on February 6, 2003. At that time, Dr. Yang encouraged Majka to continue taking Naproxen, Zanaflex, and Elavil, but discontinue the Valium and trazodone. (R. 378.) On February 26, 2003, Dr. Yang diagnosed Majka with myofascial pain syndrome and neck pain, but noted no evidence of nerve root compression, weakness, or sensory or reflex changes. Dr. Yang found that Majka had normal ambulation without assistance, full lumbar range of motion, and somewhat limited cervical range of motion. According to Dr. Yang, Majka was capable of standing, walking, and sitting indefinitely, and performing normal lifting and carrying. Majka also

---

[4]     Myofascial pain syndrome refers to pain and inflammation in the body's soft tissues. (*See* http://www.medicinenet.com/muscle_pain/article.htm.)

5

had no need to change position or posture due to pain more than once every two hours. (R. 453-55.)

Dr. Z. Syed of the Fairview Ogden Medical Group examined Majka four months later on June 23, 2003. He observed that Majka had a normal gait and did not need any assistive devices for ambulation as of April 2003. Majka displayed slightly decreased ranges of motion in his shoulders and his cervical and lumbar spine, but he had full strength and no muscle spasms. Dr. Syed noted that Majka reported having a herniated disk, but stated that his "[c]urrent status cannot be determined due to lack of reports." (R. 459-60.) Dr. Syed also noted a history of anxiety and depression, and opined that Majka might benefit from a psychiatric evaluation. (R. 460.)

Two days later on June 25, 2003, Dr. John L. Peggau, Psy.D., performed a psychological evaluation of Majka. (R. 462.) Majka told Dr. Peggau that during a typical day, he read the newspaper; ran errands; spent three hours per day over a four-hour period on the internet; took his children to their athletic activities; and assisted his wife in cleaning and doing dishes. Majka also stated that he enjoyed fishing; tinkering with old cars; playing board games; and doing yard work and home maintenance. (R. 463.) Majka told Dr. Peggau that he did not suffer from depression, other than "mild depression associated with adjusting to his concern about finances and his large mortgage." (Id.) Based on his examination, Dr. Peggau diagnosed Majka with a mild adjustment disorder and concluded that he could work with co-workers, supervisors, and the public. Dr. Peggau stated that Majka was capable of handling simple instructions and some semi-complex instructions, as well as dealing with customary work pressures. He assigned Majka a current Global Assessment of Functioning ("GAF") score of 85+ and estimated that Majka had functioned at a GAF of 90+ within the preceding year.[5] (R. 464.)

---

[5]     A GAF of 81-90 is indicative of absent or minimal symptoms, with no more than everyday problems or concerns. A GAF of 91-100 indicates superior functioning. *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition - Text Revision (DSM-IV-TR)* 34 (2000).

On September 16, 2003, Majka had an MRI of the cervical and lumbar spine which revealed "bulging disk L4-5 right paracentral herniation small"; "mild left paracentral bulge L5-S1"; "questionable high signal demyelination in C3 at the level of C3 in the cord"; "right lateral bulge or herniation C3-4 mild"; "mild diffuse bulge C5-6"; and "mild left bulge C7-T1." (R. 475-76.) Shortly thereafter on November 19, 2003, Dr. Scott Craig of the Marianjoy Medical Group reported that Majka was unable to return to work due to chronic neck and back pain related to injuries he sustained in the September 2002 car accident. Dr. Craig noted that Majka was receiving continued outpatient therapy for pain control. (R. 472.)

More than six months later on June 2, 2004, Dr. Craig indicated that "the complicated nature of [Majka's] pain, depression, sleep dysfunction, and social affairs have prevented a successful return to any vocation." Dr. Craig noted, however, that he had "encouraged Mark to explore possible vocational options with light duty restrictions." (R. 474.) On September 9, 2004, Dr. Krieger found that, based on his review of Dr. Craig's records, it appeared that Majka had completed a residual functional capacity evaluation on February 6, 2004 at Sherman Health Center. The record does not contain a copy of that RFC but, according to Dr. Krieger, it reportedly showed that Majka had limited ability to lift; decreased tolerance for forward bending in either sitting or standing; decreased tolerance for kneeling, crouching, repetitive squatting or crawling; and decreased tolerance for static standing and sitting. Dr. Krieger thus concluded that Majka "has remained in the same deconditioned state with chronic pain and is unable to return to work." Dr. Krieger planned to refer Majka to a comprehensive pain management program. (R. 479.)

B.    Majka's Testimony

Majka testified that he worked at Tweeter Home Entertainment from April 2001 until July 2002 when the store was relocated and he developed "problems – differences with the new manager there." (R. 489.) Majka stated that he has constant neck and lower back pain that travels

7

into his arms, and that he experiences spasms and numbness in his arms and tingling in his fingers. Majka complained of headaches and problems sleeping and concentrating, and estimated that he can only walk a block or two due to pain. (R. 491-92.) He testified that he experiences back pain and spasms when he lifts a 10 to 15 pound grocery bag, and stated that he could only sit upright for about a half-hour. (R. 492.) Approximately two months prior to the hearing, Majka was prescribed a Duragesic patch. When he took the full dosage (two patches), he went into a drug-induced state and was unable to drive. (R. 492-93.) Majka reported seeing Dr. Craig every two weeks and psychiatrist Dr. Casaccio since September 2002, but there are no records reflecting the course of this treatment. (R. 493.)

Majka testified that he had a cyst surgically removed from his lower back in December 2002 but that no one ever suggested surgery as an option for his spine. (R. 496-97.) Majka stated that he had a stimulator jacket that provided him with relief, but he admitted that he did not wear it "as often as I should." (R. 498.) The pain greatly affected Majka's concentration and sleep, and contributed to his depression. He did, however, walk to the park and the library, read, and conduct research on the internet for 20 to 40 minutes at a time. (R. 499-500, 503.) Majka testified that "the doctor" and the "people who would transport me to doctor's appointments" recommended that he use a cane. He claimed to need the cane 80 percent of the time, but not in his small one-bedroom apartment or when he went up and down the stairs carrying laundry or groceries. (R. 504.)

C. **Vocational Expert Findings**

Stanley Hunton, Ph.D., testified at the hearing as a Vocational Expert ("VE"). The VE characterized several of Majka's past relevant jobs as light work, including retail electronics salesman, technical consultant, and project manager. (R. 506.) The ALJ asked the VE whether an individual with Majka's work experience, age (42), education (14 years), and limitations as described in State Agency physician Dr. Madala's opinion, could return to any past work. (R. 506-

8

07.) The VE testified that such an individual would be capable of performing Majka's past work as a salesman, technical consultant, technical manager, project manager, and regional manager. (R. 507.) The individual would also be capable of performing the full range of unskilled sedentary work. (R. 508.) If the individual needed to use a hand-held assistive device, he would still be capable of performing all but the sales job. (R. 507.) Giving full credit to Majka's testimony regarding pain and lack of sleep, however, there would be no jobs he could perform on a sustained basis. (R. 508-09.)

## D.    The ALJ's Findings

The ALJ found that Majka was capable of performing at least a significant range of light work, including past relevant work as a retail electronics salesman, project manager and technical consultant. (R. 21-22.) In reaching this conclusion, the ALJ found that Majka's "statements and testimony concerning his impairments and their impact on his ability to work, when compared against the objective medical evidence and evaluated using factors in Social Security Ruling 96-7p, are not credible." (R. 20.) The ALJ found no medical evidence supporting a claim of a disabling back or mental condition, and noted that Majka's testimony that his doctor suggested he use a cane and undergo back surgery were "at variance with information in the record." (Id.) The ALJ also found it significant that Majka had moved to a third-floor apartment three months prior to the hearing, and that he admitted to not wearing a muscle stimulator jacket as often as he should. In the ALJ's view, such evidence was inconsistent with Majka's complaints of disabling pain, as were his "activities, mental and physical." (Id.) The ALJ acknowledged Dr. Craig's opinions in November 2003 and June 2004 that Majka was unable to return to work, but discounted those assertions as inconsistent with both the medical evidence and Dr. Craig's decision to encourage Majka to explore vocational light duty options. (R. 20-21.)

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Majka is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). (citation omitted).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

### B.    Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death

10

or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). In addition, the claimant must show that he had disability insured status at the time he became disabled. 20 C.F.R. § 404.131; *West v. Apfel*, No. 99 C 6235, 2000 WL 1847766, at *1 (N.D. Ill. Dec. 14, 2000).

## C.     Analysis

Majka argues that the ALJ erred in concluding that he is capable of performing at least a significant range of light work.[6] He claims that the ALJ improperly discounted his complaints of debilitating pain and ignored objective medical evidence of disability. The court disagrees.

### 1.     Majka's Credibility

In assessing a claimant's subjective complaints of pain, an ALJ must first determine whether those complaints are supported by objective medical evidence. *See* SSR 96-7p, at 2; *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). If not, the ALJ must consider other factors, including: (1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

---

[6]     Majka asserts that the ALJ found him capable of performing medium work, but this position is not supported by the record. (Pl. Mem., at 10; R. 21-22.)

The objective medical evidence in this case does not support Majka's complaints of pain. X-rays taken the day after Majka's September 19, 2002 automobile accident showed no fracture or other bony abnormalities in his cervical spine, and only a slight narrowing of the disk space at L4-L5. (R. 122-23.) Over the next year, some six treating and consulting physicians all found that Majka's reports of pain did not coincide with the medical evidence. Dr. Vraney found "[no]thing that would seem to qualify as true radiculopathy" (i.e., pain, numbness, tingling, or weakness), no signs of myelopathy (spinal cord injury), no paraspinal muscle spasm, and full range of motion. (R. 133-34.) Dr. Vraney also described an MRI of Majka's neck as "quite unimpressive," and found "very minimal degenerative type changes and nothing that would explain the wide variations of symptoms that Mr. Majka complains of." (R. 131.)

Dr. Stadlan similarly reported in November 2002 that he could not determine a cause for Majka's pain; that "[a] lot of his tremors and complaints appear to be non-anatomic"; and that "[w]hen [Majka] is not being observed, he does not appear to have any abnormal movements." (R. 176-77.) Around the same time, Dr. Bauer found no significant spinal cord or nerve root compression; no obvious weakness of Majka's arms or legs; and inconsistent sensory testing. (R. 182.) Majka tolerated fairly well a cervical rehabilitation program at Orthosport Physical Therapy between November 18 and December 26, 2002, and "continue[d] to present with neurological symptoms that are inconsistent with medical diagnosis of cervicalgia." (R. 145-46.)

In January 2003, Dr. Krieger noted that Majka reported ongoing muscle spasms from the car accident and that he had a possible herniated cervical disk and lumbar degenerative disk disease. (R. 423.) On consultation, Dr. Yang diagnosed neck and back pain due to a whiplash-type injury that seemed to be "myofascial in nature." (R. 376.) By January 28, 2003, however, Majka's pain was under better control. (R. 416, 420.) When Dr. Yang saw Majka on February 26, 2003, he diagnosed myofascial pain syndrome and neck pain, but noted no evidence of nerve root compression, weakness, or sensory or reflex changes; normal ambulation without assistance; full

12

lumbar range of motion; and somewhat limited cervical range of motion. According to Dr. Yang, Majka was capable of standing, walking, and sitting indefinitely, and performing normal lifting and carrying. Majka also had no need to change position or posture due to pain more than once every two hours. (R. 453-55.) This assessment was consistent with State Agency physician Vidya Madala's January 29, 2003 determination that Majka could occasionally lift 50 pounds; frequently lift 25 pounds; stand, walk, and sit for about 6 hours in an 8-hour workday; occasionally perform balancing; and frequently perform all other postural limitations. (R. 444-51.)

On June 23, 2003, Dr. Syed made similar observations, finding that Majka had a normal gait; did not need any assistive devices for ambulation as of April 2003; displayed slightly decreased ranges of motion in his shoulders and his cervical and lumbar spine; and had full strength and no muscle spasms. Dr. Syed noted that Majka reported having a herniated disk, but stated that his current status could not be determined due to lack of reports. (R. 459-60.)

On November 19, 2003, more than a year after the September 2002 accident, Dr. Craig for the first time reported that Majka was unable to return to work due to chronic neck and back pain related to that accident. (R. 472.) Dr. Craig repeated this assertion six months later on June 2, 2004, but there are no medical records describing Majka's course of treatment with Dr. Craig, much less supporting a claim of total disability. The ALJ fairly discounted this opinion as inconsistent with all of the other medical evidence in the record, which he described in detail at R. 16-20. *See* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("A treating physician's opinion is entitled to controlling weight [only] if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.") A September 16, 2003 MRI did reveal "bulging disk L4-5 right paracentral herniation small"; "mild left paracentral bulge L5-S1"; "questionable high signal demyelination in C3 at the level of C3 in the cord"; "right lateral bulge or herniation C3-4 mild"; "mild diffuse bulge C5-6"; and "mild left bulge C7-T1." (R.

13

475-76.) These "mild," "small," and "questionable" conditions, however, do not support Majka's claim of total disability. Indeed, by June 2, 2004, even Dr. Craig was encouraging Majka to "explore possible vocational options with light duty restrictions." (R. 474.)

In addition to noting the absence of an objective medical basis for Majka's pain, the ALJ also concluded that his activities were inconsistent with claims of disabling pain. On June 25, 2003, approximately six months after Majka filed his claim for disability benefits, he told psychologist Dr. John Peggau that during a typical day, he read the newspaper; ran errands; spent three hours per day over a four-hour period on the internet; took his children to their athletic activities; and assisted his wife in cleaning and doing dishes. Majka also stated that he enjoyed fishing; tinkering with old cars; playing board games; and doing yard work and home maintenance. (R. 463.) At the June 2004 hearing, Majka testified that he still plays with his children, though not as much as he would like, and frequently goes to a food bank at a local church. He also reported walking to the park and the library, reading, and conducting research on the internet for 20 to 40 minutes at a time. Significantly, just three months before the hearing, Majka moved into a third-floor apartment where he lived alone and cared for himself. He also admitted that he did not wear a stimulator jacket that provided him with relief "as often as I should." (R. 498.)

The ALJ also rejected Majka's claims of disabling pain based on his unsupported testimony that his doctor suggested that he use a cane. (R. 20.) The record actually reflects that on February 26, 2003, Dr. Yang found Majka to have normal ambulation without assistance. Three months later on June 23, 2003, Dr. Syed similarly observed that Majka had a normal gait and reported that he had not needed any assistive devices for ambulation since April 2003. Notably, several of Majka's doctors expressed concern that he exaggerated his pain.

As for Majka's mental condition, Dr. Craig reported on June 2, 2004 that "the complicated nature of [Majka's] pain, depression, sleep dysfunction, and social affairs have prevented a successful return to any vocation." (R. 474.) Again, however, the ALJ properly discounted this

14

diagnosis as there are no medical records supporting these assertions, and Dr. Craig is a doctor of physical medicine and not a psychiatrist or psychologist. *See, e.g., Hanson v. Apfel*, 151 F.3d 1032 (7th Cir. 1998) (noting that an ALJ must consider factors such as "the length, nature, and extent of the treatment relationship; the physician's speciality; and the consistency and supportability of the physician's opinion.") The psychologist who examined Majka found him fully capable of working. In June 2003, Dr. Peggau diagnosed Majka with a mild adjustment disorder and concluded that he could work with co-workers, supervisors, and the public. Dr. Peggau stated that Majka was capable of handling simple instructions and some semi-complex instructions, as well as dealing with customary work pressures. Notably, Majka himself told Dr. Peggau that he did not suffer from depression, other than "mild depression associated with adjusting to his concern about finances and his large mortgage."

Given the evidence in the record, the ALJ was not "patently wrong" in determining that Majka's complaints of disabling pain were not credible. *Powers*, 207 F.3d at 435. Majka's motion for summary judgment on this basis is denied.

## 2.    The RFC Determination

Majka also objects that the ALJ's RFC determination is inconsistent with the record evidence. The VE testified that an individual with Majka's work experience, age (42), education (14 years), and limitations as described in State Agency physician Dr. Madala's opinion, could perform Majka's past work as a salesman, technical consultant, technical manager, project manager, and regional manager, and would also be capable of performing the full range of unskilled sedentary work. (R. 507-08.) If the individual needed to use a hand-held assistive device, he would still be capable of performing all but the sales job. (R. 507.)

Majka finds it significant that a February 6, 2004 RFC assessment showed that he had limited ability to lift; decreased tolerance for forward bending in either sitting or standing; decreased

15

tolerance for kneeling, crouching, repetitive squatting or crawling; and decreased tolerance for static standing and sitting. This RFC does not appear in the record but is referenced in Dr. Krieger's September 9, 2004 letter addressed "To Whom It May Concern." (R. 479.) The ALJ did not have this letter at the time he made his decision, though the Appeals Council did. In the court's view, these stated limitations are consistent with the ALJ's conclusion that Majka is capable of performing a full range of light work. Dr. Madala concluded on January 29, 2003 that Majka could perform medium work, including occasionally lifting 50 pounds; frequently lifting 25 pounds; standing, walking, and sitting for about 6 hours in an 8-hour workday; occasionally balancing; and frequently performing all other postural limitations. (R. 444-51.) Dr. Krieger's observation that Majka had "limited" ability to lift and "decreased" tolerance for bending, kneeling, crouching, standing, and sitting does not conflict with a finding that Majka could perform light, as opposed to medium work.

Nor does the court find error in any failure to accord Dr. Krieger's September 9, 2004 letter significant weight. Based on the February 2004 RFC (which, as noted, does not appear in the record), Dr. Krieger concluded that Majka "has remained in the same deconditioned state with chronic pain and is unable to return to work." (R. 479.) As with Dr. Craig, however, there are no medical records describing Majka's course of treatment or supporting this diagnosis, and it conflicts with all of the other objective medical evidence. Dixon, 270 F.3d at 1177 ("A treating physician's opinion is entitled to controlling weight [only] if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.") The ALJ's RFC determination is supported by substantial evidence and will not be overturned here.

16

## CONCLUSION

For the reasons stated above, the Commissioner's motion for summary judgment [Doc. 26] is granted, and Majka's motion for summary judgment [Doc. 21] is denied. The Clerk is directed to enter judgment in favor of the defendant.

ENTER:

Dated: November 1, 2006

*Nan R. Nolan*

NAN R. NOLAN
United States Magistrate Judge